Today our first case is United States of America v. Woodson. We have Mr. Lopez for the appellant and Mr. Juman for the appellee. Mr. Lopez, if you are ready to proceed, please begin. You have five minutes reserved for rebuttal. Good morning. Judge Branch, may it please the court. In the early morning hours of January 26, 2018, two local detectives interrogated Mr. Woodson for approximately one hour in an unmarked police van that was parked outside of his home in Ashburn, Virginia. The government has conceded that Mr. Woodson was not informed of his Miranda rights either before or during the one-hour interrogation. And so the question for this court is whether the government has met its heavy burden of presenting evidence and proving that the confession that Mr. Woodson gave during that one-hour interrogation was voluntarily given. Counsel, in U.S. v. Brown, we said unambiguously advising a defendant that he is free to leave and is not in custody is a powerful factor in the mix and generally will lead to the conclusion that the absence of finding of restraints that are so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview. I've listened to the recording. I know that's how the officers advised Mr. Woodson. So how do you overcome that? Yes, Your Honor. I'm glad you brought up United States v. Brown because I urged this court to compare the facts of Brown with the facts of this case. You talked about the recording. Here in the beginning, just one time that he was not under arrest. They never told him he was free to go during that recording. The facts of Brown are just so strikingly different. There, the police informed Mr. Brown approximately at least three different times that he was not under arrest, that he was free to go, and that he was not being detained. And importantly, this court stressed the fact that the police also made sure that he understood those warnings and what they had just told him each and every one of those times. There are also different facts because the standard is totality, the circumstances. In Brown, the individual was interrogated in his own home. I think it was actually his girlfriend's home that he shared with her. Here, the interrogation took place in an unmarked police van with two detectives flanking Mr. Woodson, police still never talked about, is all the facts that occurred prior to the interrogation. All the facts that occurred when the police were, in fact, executing that search warrant at his home in Virginia. Those are all relevant facts. Those are all part of the totality of the circumstances. So you have the pre-interrogation facts, you have the facts during the interrogation, which are completely different than Brown. Which of those facts do you think are particularly important? I think they're all the facts that the magistrate judge never focused on, and in fact, the government never presented any evidence on, was the facts that occurred prior to the interrogation. So some of those factors include the number of police officers, which this court and the Supreme Court has said is important. So there were 15 to 20 police officers in Brown. There were four officers who never unholstered their firearms. So you have 15 to 20 police officers, they were armed, they were wearing body armor, they had their firearms drawn. There was also the testimony from Brandon, Mr. Woodson's brother, that the magistrate judge thought was very reliable, stating that the police actually pointed those firearms at the occupants of the house. There's the fact that Mr. Woodson was handcuffed between 15 and 30 minutes, and I think in light of the recent decision from the United States Supreme Court in Torres v. Madrid, that's a very important factor. And the magistrate judge never focused on that. Am I correct that he was not handcuffed during the questioning? He was not handcuffed during the questioning, Your Honor. Okay. He was handcuffed for like 15 to 30 minutes before the detective got there. Once he got there, then he and his brother were unrelieved of the handcuffs, and then escorted out to the unmarked van. Has this court ever found that a set of restraints was so extensive that it overpowered the presumption set forth in Brown? Your Honor, I think all the case law regarding the restraints changes dramatically following the Supreme Court's decision in Torres v. Madrid, because there the Supreme Court created a bright line. What is seizure under the Constitution? There, all they said was, if you have an application of force against a suspect, plus the intent to restrain the movement of that suspect, that's it. That's a seizure. And clearly that happened here. There was application of force on Mr. Woodson with an intent to restrain his movement. That was a seizure. So any cases dealing with prior restraints I think has to be looked at through a different lens, and that's the lens that the Supreme Court has stated in Torres v. Madrid. How long does that last? So let's say that they had, let's say that all the events before the questioning had happened just like they did, and then the detectives left and came back the next day. Would the fact that he had been handcuffed the day before make a difference in the analysis still? Well, that's an excellent question, Your Honor. So if there's a seizure, when does the seizure stop and maybe is it attenuated? Here, from the testimony of the detective who testified at the suppression hearing, it happened almost immediately. He got there. He actually said that Mr. Woodson was not handcuffed at the time. Mr. Woodson and his brother said that they were relieved of their handcuffs once the detective got there. And the magistrate judge actually held in her report and recommendation that the detective was mistaken on that point. So she credited the testimony of Brandon and Mr. Woodson that they were indeed still handcuffed when the detective got there. The detective said he got there and almost immediately he took Brandon and then Mr. Woodson to the unmarked car to testify. So I think that's one sequence of events, one set of circumstances which this court has to look at the totality of the circumstances. What do we do with the testimony of the brother, Brandon, that he didn't feel like, I mean, I'm paraphrasing, but that he didn't feel like he was coerced during his interview and he knew that he could not cooperate if he didn't want to? Yes, Your Honor. I think the law is clear, the law in this court and the Supreme Court, that this is completely an objective standard, an objective test. The subjective view of any of the individuals, the police, the person that's being detained, whatever, is not relevant to that analysis. Let me ask you a question about that. It's obviously an objective test, but wouldn't the witnesses to the events, so, you know, we're trying to recreate sort of the atmosphere at the home when the SWAT team came in and the handcuffs were on, then the handcuffs were removed. Why wouldn't that be relevant to the extent it reflects what someone who was there, who saw all that, who actually experienced it in real time, what they thought? It may not be dispositive because it's objective, not subjective, but why wouldn't it just be relevant that that's what someone thought at the time? I think the court, this court, again, this court and the Supreme Court has helped in many different cases and I would welcome an opportunity to brief those cases to the court in which the subjective views of the individuals involved, that is the police officers or any witnesses or anybody who was being detained, those subjective views are irrelevant to the calculus as to whether objectively somebody, a reasonable person in that position would have been felt free to leave or felt responsible. There's a case, and I'm just not familiar with it, maybe there is one, there's a case where there was someone else who was also present, who was also interviewed and who testified that he or she knew that he was voluntarily cooperating and some court said that's completely irrelevant. I don't know any of that case. I don't think that case exists. I think this is the first issue. I mean, I guess that's my, this seems like a question of first impression as to whether that's relevant or not. I mean, why wouldn't it be, I guess, so let me just give you this hypothetical. I mean, let's say the cops come into, let's say they came into this house and there were 30 people in the house and they put them all in handcuffs and then they undid the handcuffs and then they interviewed each person individually and 29 of those people who were all innocent of crimes said, yeah, we knew that, you know, based on the atmosphere at the time and what the cops were saying, we knew that we didn't have to cooperate. We knew that we were voluntarily cooperating and the only person who was claiming that he was coerced was the one who was guilty of a crime who cooperated too. Would that be completely irrelevant? Um, 29 against one. Um, I would still say that the subjective views of the individuals involved are not relevant to the, and especially not here. Although you did have Brandon testify that he felt that he could not leave the house. He felt that he had to stay in the house. And then you had a subjective view of, of Mr. Woodson and the, and the magistrate judge correctly said, I can't take into account his subjective views. So what was the purpose? I mean, you call, not you, but I mean that your side called Brandon to testify. Um, what was the purpose of calling him to testify? Your Honor, the motion that was filed made it clear that the pre interrogation, uh, facts were very relevant. Um, and that, and that was part of the coercion on Mr. Woodson and the government never presented any evidence. So he was there as somebody else who was in the house who could testify. You know, the police came, they were armed, they, they pointed the firearms at the occupants, those things that we argue would coerce, um, to, uh, on Mr. Woodson. And you would say, and I didn't just correct me if I'm wrong, but you would say those would be sort of objective facts. He testified to those objective facts, which are relevant. Then his own interview and whether he thought he was coerced by statements that were made would be irrelevant because that's his subjective impression. That's correct. That's the line you're on. Okay. And I know Mike, Mr. Lopez, I actually have a question for you. Um, are you challenging on appeal, the district court's determination that the evidence from the note three cell phone would have been inevitably discovered? No, we did not challenge it on appeal, Your Honor. I think that was, if you look at the search warrant that was executed, although it turns out that the police that were actually there, uh, with the, with the, with the guns didn't have the search warrants that the detective did, they showed up later. But if you look at the search warrant and the application that came to it, it listed all those. And I believe it listed the, the S three note, um, Samsung, whatever, um, this maybe misnaming it, but I, that's clear. So what, what, what would your response be to the government's argument that even if this interview of Mr. Woodson was erroneously admitted, there was overwhelming independent evidence of his guilt? Yes, Your Honor. I know my time's up, so I'll try to be brief, but, uh, I think there are three distinct ways in which, uh, the admitted confession substantially influenced Mr. Woodson's trial. First, it substantially strengthened the government's case. They had this other evidence, but all that other evidence, if you look at it closely, it's all circumstantial evidence. Um, and you could tell that it really affected the case by just looking at the government's opening statement. The evidence on the cell phone was circumstantial evidence? Yes, Your Honor. None of it really directly. So all of it kind of demonstrated that a person with a certain email or a certain, uh, kick account was the one that was, uh, dealing with the young victims here. And then you had to try and connect that to Mr. Woodson, but there were at least two other males there in the house that had access to, to those electronic, uh, devices, uh, that had, um, access to, to the Wi-Fi. So yes, uh, there was a lot of that, that evidence, but it was, uh, circumstantial. So that the, the confession substantially strengthened it as seen by the government's opening statement. Um, second, it really whetted the defense to the statements that Mr. Woodson made specifically that somebody in, I think he said the UK, but that somebody in Ireland that he did all this, but the only reason he did it was because he was forced to by somebody in Ireland. So that became the defense once we knew that, that that was going to be admitted. And third, I think it substantially influenced Mr. Woodson's decision as to whether he testified. So once the statement came in, once that became the defense, it was clear that he had to testify. And I appreciate the court allowing me to go over and go that with you. Thank you, Mr. Lopez. And you do have five minutes for rebuttal. Thank you, Your Honor. Robert Juman. Thank you, Your Honor. May it please the court. Robert Juman for the United States. Um, I'd like to begin, uh, Your Honor, where you're, you began, uh, with the Brown presumption. As Your Honor pointed out, this is a case where the Brown presumption applies and that has not been overcome by the rest of the totality of the circumstances. Not to belabor the point, but during the interview, we, it's undisputed that the officers brandished no weapons. The, uh, Woodson was not restrained. He had seen his brother voluntarily leave and return without being arrested, without being in handcuffs. Uh, there was no tone or language indicating that compliance could be compelled. The transcript itself, which was recorded and played in the trial and at the suppression hearing made clear there was no coercion. The questioning took place in as neutral a location as possible given the weather, a unmarked police vehicle, and that the entire interview lasted less than an hour with only two officers present. And finally, as Your Honor pointed out, we have Brandon's testimony, uh, which was elicited by Woodson that, uh, he did not feel, uh, that his will was overborne. He was the, the epitome of a reasonable, innocent person who had undergone the exact same totality of circumstances and he did not feel that he was being coerced to talk to the police. And the magistrate and the district court were properly relying on that as part of the analysis. But even without Brandon's testimony, the remaining circumstances do not overcome the presumption that comes from Brown. As, uh, Your Honor's also pointed out, any error in the admission of this, uh, interview was harmless. Uh, and just want to focus, uh, not just on the amount of evidence that was found on the Note 3, uh, but there was also similar evidence found on the S8 phone, which was found with the defendant at the time of his arrest, eight months later, and that there's no issue about. Um, and that phone contained many of the same pornography images from the other phone. In fact, it contained evidence of extortion of some of the same victims. It included evidence of extortion of a victim on the morning of his arrest. So that existed independent of his interview. The search warrants on Woodson's social media accounts was independent. Um, you also had the, again, the fact of the Note 3, as Your Honor's pointed out, it was inevitably going to be discovered. And the key, this was almost like Cinderella's slipper. Whoever had this phone was their target. And the phone was found hidden in a pillowcase in Woodson's bedroom. That evidence, again, independent of the interview, would have linked him to all of the evidence on the phone. This was not a circumstantial case. This was a case filled with digital evidence of the defendant's crimes. And we, I understand that it's possible that the outcome of the suppression hearing could have influenced his decision to testify, but there's nothing in the record to indicate that. And so another piece of evidence, overwhelming piece of evidence, that the jury had was the defendant's own testimony and admission. And he chose, he could have said, look, what he's saying now. I don't pay any attention to that statement I gave to the police. I was being coerced. My will was overcome. He chose not to. He chose to testify. He chose to double down on that defense. And so the jury, again, heard all of that evidence. And the record's clear that that evidence alone would have been enough to convict him. And furthermore, the jury was instructed to treat his statement, his interview statement, with caution and great care. That's part of the standard jury instructions that were given. Can I ask you about the brother's testimony? So, I mean, I'll just confess, I think that's the legal issue in the case is how to evaluate that. Yes, Your Honor. So, I mean, we do have this case law that says subjective impressions are not, you know, that's not dispositive. Absolutely. How do you sort of weigh that? I think there are two ways to address that in this case. The first is, as Your Honor pointed out, the defense called Brandon. They elicited his testimony. And if there was error, which I don't think there was, it's invited error. But putting that aside, the issue is what do the courts mean when they say it's a subjective test? When you read Berkmer v. McCarty, it's clear what they're trying to do is get away from the defendant's subjective view. That's the subjectivity they're trying to avoid. They're saying, we don't know what the defendant was thinking, and we're going to exclude that. We want to look at what the circumstances were. We also don't want to consider what the police wanted to do, because there's no way the defendant could have known that. But if you had a situation, again, to use a theoretical possibility, if the defendant had gotten on the stand and said, you know what, I was in no way coerced. I knew I could leave. I knew I wasn't under arrest. Certainly the court could consider that, even though that's arguably subjective, because it doesn't fit within that bias we're concerned about, a self-interested defendant saying, oh, my will was overcome. How can we be any more confident that we can rely on the subjective impression of a third party than we can on the subjective impression of the defendant or the police? That is a determination that the fact finder has to make. That's true. But the question here is whether it's permissible or not permissible. No, well, that's what I'm saying. As a rule, how could we be more certain that we can rely on the impressions and subjective views of bystanders than the impressions and subjective views of defendants and police? They're not. They don't have the same interests. They're not the ones who are on trial. They're not the suspect who is going to go to jail if this evidence comes out. What if it's your brother? In this case, obviously, the brother said the other way. But don't you think that many siblings or husbands or wives or children or friends would have real interest in keeping their loved one out of prison? They absolutely would. And that would go to their credibility. But the law would not preclude the court from considering it if there were other indicia of reliability. Here, Brandon, in a sense, testified against his brother's interest, which made it reliable, which is why the court was believing it. On the other hand, maybe he thinks his brother is a bad guy and doesn't want his brother to molest children, so he wants to, right? That's certainly possible, and that's the kind of thing that goes into any kind of credibility analysis. But again, maybe to take this into a different realm, Burkhamer doesn't exclude all subjectivity. The question, for example, of whether it was cold outside, a witness is going to have to testify to that, and there's some subjectivity to that. Whether the tone was aggressive, that's a subjective opinion of some witness. We don't take the defendant's opinion of it because of the bias, but another party, the 29 other people who are present at the search, for example, the reason we would listen to them on that issue is understanding that they may have interest, they may be subject to credibility analysis, their perception is relevant to the analysis of the totality of the circumstances. But is it their perception of the ultimate legal conclusion, right? Isn't that what we're really asking for an impression of in this instance? Fair enough. We are certainly not looking to these witnesses to give an ultimate legal conclusion, but the sense, the feeling that Brandon had in this circumstance is as close as we can get to having a video recording of the proceeding. We had an audio recording, and we had a reasonable, innocent person who actually went through the same circumstances. There's no reason in logic to preclude that evidence, and the law doesn't require us to ignore it either. And I will say, in this particular case, even if the court did exclude it, even if it wasn't invited error, the remaining circumstances, the remaining totality of the circumstances still don't overcome the Brown presumption. They still show no coercion. So certainly in this case, there is no reason to question the magistrate court's finding or the district court's finding that there simply was no coercion here, there was no coercion for the purposes of Miranda. I would just also like to note a couple things. To the extent that the initial search was a factor, and we're not denying that it's something the court can consider, we're just saying that it doesn't overcome the remaining totality of the circumstances, the evidence, again, viewed in the light most favorable to the government, is that the initial entry was soft, there was a knock on the door, the weapons were held at a low ready position, the detective who took off the handcuffs under any view of the evidence arrived only 15 minutes later, and Woodson's handcuffs came off at the same time as Brandon's. So his handcuffs had been off for quite a while before his interview even began. I do want to note that the appellant's brief repeatedly mentions that he was made to lay face down for half an hour. That must come up at least four or five times. There is no evidence of that in the record. In fact, the record suggests that Woodson was sitting in a chair. Brandon testified Woodson was in a chair. Oksanen, the detective, said the whole family was sitting. This is all in page, in Documentary 65. Woodson said he was sitting in the living room, not face down, and there's no reference in the transcript to anybody being face down, and there's no reference in Woodson's briefing on the motion to suppress or in the objections to the report and recommendation to him being face down. So that's simply not in the record. If the court has no other questions, I'm happy to rest on our papers, and we ask that the conviction be affirmed and that the sentence be affirmed. Thank you, Mr. Chuman. Mr. Lopez, you have five minutes in rebuttal. Thank you, Your Honor. Just very quickly, some points brought up, as Judge Edmonton would say, my brethren. The facts, again, the government argues that the facts should be viewed in the light most favorable to the government. The government presented no facts concerning anything that happened before the detective arrived at the house. So you cannot view that in the light most favorable to the government as far as anything that they failed to present. In fact, they were the only ones that probably could have presented that evidence, and so there should be an inference held against the government. And in fact, my brethren also talked about the fact that there was an audio recording, no video recording. In fact, there was a video recording that was body cam recording that was destroyed by the police, and the detective testified to that. I believe that's page 34 or 35 of the suppression hearing. So there was evidence. The government just never presented the evidence as to what happened. And so as far as any inference as to what happened during that time, it should not be viewed in the light most favorable to the government because they failed to present the evidence that they alone had. There are some distinctions, too, between Mr. Woodson and his brother. There was, if you look at the interview from Brandon, I believe some of Brandon's testimony, he is, I would say, more highly functioning. He's the only other one in the house besides Jerry Browning, the government's initial target or the police's initial target. They're the only ones that drive. If you look at the testimony of our expert during sentencing, she talks about the fact that Mr. Woodson is functioning, but he doesn't do, he takes the bus everywhere. He doesn't drive. There are some things that he's very limited to, and Brandon is not equally limited. So there are some distinctions between the two of them. But again, we would argue that you need to take a look at the entire totality of the circumstances. What happened before the interview, as best as you can tell because the government didn't present any evidence, and what happened during the interview. Compare that to the Brown case. We openly invite the court to compare that to the Brown case. And you have to remember that the government bore what this court and what the Supreme Court has called the heavy burden of proving that a defendant's testimony or confession was willingly given when there are no Miranda warnings given. And that's all we're asking for. The police can do what they did in this case for the safety of the officers. We understand that. In fact, there were a couple of agents that unfortunately got shot here and were killed executing a search warrant on a child porn case. So we understand that the police should have the ability to do what they did in this case. And all we're saying is if you're going to come in with 12 to 15 armed police officers, if you're going to have the individuals handcuffed for 15 to 30 minutes for the length of this oral argument, and then you're going to interrogate somebody for an hour, simply give them the Miranda rights. And the police knew that. And they should have done that in this case. What happened when the police came back later? In fact, they were going to arrest him. They gave Mr. Woodson his Miranda rights. He refused to talk to him at that point. And that was the fear of the police officers. They came in, they used these tactics, but they failed to do the basic to provide Mr. Woodson with the Miranda warnings. If you look at the totality of the circumstances, if you compare this case to any case, to the Browning case, any other case before this court, if you look at the Torres v. Madrid case and the effect on the circumstances in this case, you have to come to the conclusion that the totality of the circumstances makes it clear that Mr. Woodson and a normal person, an average person in that position would have felt not free to leave, would have felt that they were in fact being detained. And at that point, the government, the police should have given him his Miranda Miranda warrants. And I thank the court for its time, unless the court has some questions. Thank you, Mr. Lopez. Thank you both. And we have your case under submission.